**UNITED STATES DISTRICT COURT**
District of New Jersey

CHAMBERS OF
**JOSE L. LINARES**
JUDGE

MARTIN LUTHER KING JR.
FEDERAL BUILDING & U.S. COURTHOUSE
50 WALNUT ST., ROOM 5054
P.O. Box 999
Newark, NJ 07101-0999
973-645-6042

**NOT FOR PUBLICATION**

**LETTER OPINION**

June 24, 2008

**Via Electronic Filing**

Jake C. Santos, Esq.
Norrie & Associates
500 International Drive N., Suite 125
Mount Olive, NJ 07828

Susan Branagan, Esq.
Social Security Administration
Office of the General Counsel, Region II
26 Federal Plaza, Room 3904
New York, NY 10278

        Re:    **Spasija Ilieska v. Commissioner of Social Security**
                  **Civil Action No.: 07-2252 (JLL)**

Dear Counsel:

      Presently before the Court is an appeal filed by Spasija Ilieska (hereinafter "Claimant") seeking review of the Administrative Law Judge's ("ALJ") decision denying her Supplemental Security Income ("SSI") benefits. No oral argument was heard. Fed. R. Civ. P. 78(b). For the reasons set forth below, this Court remands the ALJ's decision, specifically with respect to steps two and four of the five-step sequential analysis of disability determination.

**PROCEDURAL HISTORY**

      On August 11, 2004, Claimant filed an application for SSI benefits. The application was denied initially and again upon Reconsideration. A hearing was held before ALJ Irving Fliegler on May 19, 2006. ALJ Fliegler denied Claimant's application on June 15, 2006. On March 9, 2007, the Appeals Council denied Claimant's request for review. Claimant now appeals ALJ Fliegler's ruling pursuant to 42 U.S.C. § 405(g).

## FACTUAL BACKGROUND

Claimant, Spasija Ilieska, was born on May 1, 1944. (R. 183). Claimant grew up in Macedonia and lived there until she immigrated to the United States in 1991. (R. 235). She is fluent in Macedonian and has limited understanding of the English language. (R. 236). She was last employed as a factory worker at a lampshade manufacturer where she would sit for eight to nine hours at a time. (R. 232). Claimant alleged that she was disabled as of April 20, 2004 due to depression, peripheral neuropathy, carpal tunnel syndrome, lower back pain, and degenerative disc disease of the spine. (R. 216). She had previously worked in a sewing machine factory in Macedonia and as a file clerk in a hospital in the United States. (R. 234). The file clerk position was created specifically for Claimant and allowed her to work alongside her daughter. (R. 236). Claimant was 59 years old when she first applied for benefits. (R. 18).

Claimant's medical history is extensive. In 1977, Clamant was involved in a motor vehicle accident resulting in a three day coma, neck pain and chronic headaches. (R. 104). Claimant saw Dr. Tunia between March 14, 2002 and October 5, 2004, complaining of weakness, frequent headaches and depression. (R. 225). Dr. Tunia diagnosed Claimant with diabetes mellitus, hypertension, and depression. (R. 115). Claimant was prescribed Clonazepam, Lexapro, Inderal LA, Indapamide, Metformin, Lipitor and Insulin. (R. 116). Dr. Tunia found that Claimant had no restrictions lifting, pushing, sitting, or standing. Id. Claimant underwent surgery for a breast mass on May 9, 2003. (R. 185). Claimant saw orthopedic surgeon, Dr. Matteou, from February 5, 2004 to September 2, 2004. Dr. Matteou diagnosed her with degenerative disc C4 to C7 and osteoarthritis of the AC joint and the right shoulder. (R. 108). Depo Medrol and Xylocain injections were given in the right shoulder. (R. 109). Dr. Matteou found that Claimant could lift, carry, push, and pull up to fifteen pounds and sent her for an MRI of the right shoulder. Id. The MRI findings showed bursal fluid collections in the anterior aspect of the shoulder and a possible partial rotator cuff tear. (R. 113).

Dr. Strika began seeing Claimant on April 22, 2004, when she complained of dizzy spells, fainting spells, pain in her arms, numbness of the extremities, severe headaches, and lumbago. (R. 124). After the first examination, Dr. Strika diagnosed Claimant with peripheral neuropathy, lumbago, hypertension, uncontrolled diabetes, and major depression. Id. Dr. Strika gave Claimant six weeks of disability and proscribed Zoloft. Id. On June 28, 2004, a neurological examination was performed by Dr. Laskin, noting that Claimant complained of a burning pain and tingling of the arms and legs for over a year, headaches, dizziness, vertigo, general weakness and depression. (R. 104). A physical examination revealed no significant abnormalities and Dr. Laskin found muscle tension type headaches due to depression and diabetic polyneuropathy. (R. 105). He ordered an MRI of the brain, which resulted in no abnormalities. (R. 106).

A Physical Residual Functional Capacity Assessment performed by the Division of Disability Determination Services ("DDS") on October 26, 2004 found that Claimant could frequently lift ten pounds, stand for four hours, sit for six hours, and had unlimited pushing and pulling capacity. (R. 135). On November 15, 2004, DDS physician Dr. Roy performed a psychiatric evaluation of Claimant. Claimant complained that she could not sleep, suffered from severe depression, and had

pain in her right neck. (R. 142). Dr. Roy noted that Claimant had never been in a psychiatric facility and that although her memory and general fund of information were poor, her speech, thought process and senses were normal.[1] (R. 143-44). She was diagnosed with depression secondary to her physical medical disorders. (R. 144). Dr. Roy commented that at the end of the interview she seemed to use her right neck and shoulder to get her coat without any apparent pain at the time. Id. A Psychiatric Review Technique and a Mental Residual Functional Capacity Assessment were both performed by a DDS physician on November 24, 2004. The tests found that Claimant suffered from depression that mildly limited her functional capacity, and which was secondary to her medical conditions. (R. 167, 174, 180).

Orthopedic surgeon, Dr. Tiger, saw Claimant on March 25, 2005 in order to create a medical report for her Worker's Compensation claim. Claimant complained of minimal motion in her right shoulder and severe neck and shoulder pain. (R. 189). Dr. Tiger made clinical findings of loss of the usual cervical lordotic curvature, moderate spasm in the paraspinal muscles of the cervical region, trigger point tenderness on the cervical spine, full range of motion of the cervical spine, pains on the extremes of motion directed to the right side of her neck, and deltoid atrophy of the right shoulder. (R. 190). Dr. Tiger found residuals of a chronic cervical strain syndrome with chronic myofascitis with aggravated arthritis, for which he estimated a 30% partial total disability and residuals of a partial tear of the rotator cuff, muscle atrophy, and traumatic arthritis and anthrofibrosis for which he opined that Claimant had 40% partial total disability. Id. Claimant next saw Dr. Dhirmalani from April 21, 2005 to March 15, 2006 and was treated for abdominal discomfort, high blood sugar levels, neck pain, chest pain, dizziness and joint pain. (R. 192-93).

At the Social Security Administration hearing, Claimant testified that she was very depressed and could not sleep due to thoughts of suicide. (R. 240). She also testified that she was very nervous and felt like she would hit any person who came near her, that her hands were swollen and lacked strength, and that her right shoulder, hips and legs were constantly in severe pain. (R. 241-50). Claimant testified that she could not carry anything, do laundry, cook or clean, and that she would get picked up by her daughter's mother-in-law to go food shopping once a week. (R. 250-51). She also testified that she could not walk one full block and must crawl up stairs. (R. 252-53). After the hearing, Claimant's daughter wrote to the Office of Disability Adjudication and Review stating that certain mistranslations had occurred at the trial. She claimed that the translator stated that she and her mother worked in different places in the same building, but that they actually worked together in the same office. (R. 218). She also claimed that the translator asked her mother if "*heavy lifting* was required" at the file clerk position, but that the judge only asked if "*lifting* was required;" thus, when her mother answered *"no,"* she was answering the wrong question. Id. (emphasis added). She stated that as a file clerk, her mother actually lifted charts that weighed between three to twelve pounds. Id.

---

[1] He noted, however, that Claimant was accompanied by a friend who helped her to concentrate and understand the information given during the visit. (R. 145).

## LEGAL STANDARDS

### A.   Disability Determination

Under the Social Security Act, a claimant must demonstrate that she is disabled based on an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). A person is disabled for these purposes only if his physical or mental impairments are "of such severity that he is not only unable to do his previous work, but cannot, considering [his] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 1382c(a)(3)(B).

The Social Security Regulations has set forth the following five-step, sequential evaluation procedure to determine whether a claimant is disabled:

> The sequential evaluation process is a series of five "steps" that are followed in a set order. If it is determined that the plaintiff is disabled or not disabled at a step, a decision is made and the evaluation will not go on to the next step. If a determination cannot be made that the plaintiff is disabled or not disabled at a step, the evaluation will go on to the next step. The five steps are as follows:
>
> (i) At step one, the Commissioner decides whether the plaintiff is currently engaging in substantial gainful activity. If she is not employed, then the Commissioner proceeds to step two.
>
> (ii) At step two, the Commissioner must determine whether the plaintiff's impairment or combination of impairments is severe. If the impairment is not severe, the plaintiff is not disabled and the evaluation ends. If the plaintiff has a severe impairment, the analysis proceeds to the third step.
>
> (iii) At step three, the Commissioner must decide whether the plaintiff suffers from a listed impairment. If the plaintiff meets a listed impairment requirement, she is disabled. If the plaintiff does not suffer from a listed impairment or its equivalent, then the analysis proceeds to step four.
>
> (iv) Before considering step four, the Commissioner must first determine the plaintiff's residual functional capacity ("RFC"). At step four, the Commissioner determines whether based on plaintiffs RFC she can still do her past relevant work. If the plaintiff has the RFC to perform her past relevant work, she is not disabled. If she is unable to do any past relevant work, the analysis proceeds to the fifth step.

> (v) Finally, at step five, the Commissioner must determine whether the plaintiff is able to do any other work available in the national economy, considering her RFC, age, education, and work experience. If the Commissioner cannot show that work exists then the plaintiff is entitled to disability benefits.

20 C.F.R. § 404.1520(a)(4).

### B.   Burden of Proof

The five-step sequential evaluation involves a shifting burden of proof. See Wallace v. Sec'y of Health & Human Servs., 722 F.2d 1150, 1153 (3d Cir. 1983). The claimant has the burden of establishing at step one that she has not engaged in "substantial gainful activity" since the onset of the alleged disability and at step two that she suffers from a "severe impairment" or "combination of impairments." 20 C.F.R. § 404.1520(a)-(c). If the claimant establishes this, she must next demonstrate, at step three, that her impairments are equal to or exceed one of the impairments listed in Appendix 1 of the regulations. 20 C.F.R. § 404.1520(d). If she makes this showing then she is presumed disabled. If she cannot show that she meets or exceeds an impairment, then at step four she must show that her RFC does not permit her to return to her previous work. 20 C.F.R. § 404.1520(e). If the claimant cannot show this, then at step five, the burden shifts to the Commissioner to demonstrate that the claimant can perform other substantial gainful work. 20 C.F.R. § 404.1520(f). Note that the burden only shifts to the Commissioner at step five; throughout steps one through four the burden lies entirely with the claimant. However, if the Commissioner cannot meet this burden, the claimant shall receive benefits. "For each of the first four prongs, a finding of 'not disabled' will end the inquiry; otherwise the inquiry will proceed to the next level." Alexander v. Shalala, 927 F. Supp. 785, 792 n.4 (D.N.J. 1995).

### C.   Standard of Review

This Court must affirm the ALJ's decision if it is supported by substantial evidence. See 42 U.S.C. §§ 405(g) and 13839(c)(3). Substantial evidence is more than a "mere scintilla" of evidence and "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). Thus, when the "[ALJ] is faced with conflicting evidence he must adequately explain in the record his reasons for rejecting or discrediting competent evidence." Ogden v. Bowen, 677 F.Supp. 273, 278 (M.D. Pa. 1987) (citing Brewster v. Heckler, 786 F.2d 581, 585 (3d. Cir. 1896)). The District Court must review the evidence in its totality. See Daring v. Heckler, 727 F.2d 64, 70 (3d Cir. 1984). However, the reviewing court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1991). Rather, the court must give deference to the administrative decision. See Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978) (explaining that review is limited to determining whether decision as a whole is arbitrary, capricious, or contrary to law). With this framework in mind, the Court turns now to the Claimant's arguments.

## LEGAL DISCUSSION

### A.  Summary of the ALJ's Findings

The Court begins by reviewing the ALJ's application of the above five-step process. At step one, the ALJ found that Claimant was not engaged in substantial gainful activity since the date of onset. (R. 20). At step two, the ALJ found that Claimant had peripheral neuropathy and depression, but that such impairments were not "severe" within the meaning of 20 C.F.R. § 404.1520. Id. Notwithstanding his findings that such impairments were not severe, the ALJ then, inexplicably, proceeded to step three, where he determined that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments listed in 20 C.F.R Part 404, Appendix 1, Subpart P. Id.  In particular, he found that Claimant's neuropathy did not result in persistent disorganization of motor functions as required by Listing 9.08, and that her depression did not hinder her ability to perform work as required by Listing 12.00. Id. Consequently, he proceeded to step four.

At step four, the ALJ found that Claimant had the RFC to perform light work and therefore could return to her prior employment as both a sewing machine operator and a medical records file clerk. (R. 26). The ALJ's RFC determination was based on his findings that Claimant did not have a disability due to mental problems or physical problems.  The ALJ's determination that Claimant lacked mental disabilities was based on: (a) the ALJ's determination that Dr. Strika's finding of disability was not credible because his records lacked credible evidence, and (b) Dr. Roy's psychiatric examination which concluded that Claimant's psychiatric symptoms were secondary to her physical problems. (R. 22).  When crediting Dr. Roy's examination, the ALJ stated that Claimant was not in psychiatric treatment, was not on any psychiatric medications, and that her mental status examination was entirely normal. Id.  The ALJ's determination with regard to a lack of physical disabilities was based on: (a) discrediting Claimant's estimation of her physical limitations; (b) the fact that Claimant did not appear to be in any significant distress at the hearing; (c) Dr. Tunia's and Dr. Matteou's findings that Claimant could perform light work; (d) discrediting Dr. Tiger because he was retained as an attorney referral in relation with a Worker's Compensation claim; (e) discrediting Dr. Strika's determination of disability; and (f) heavily relying on the records' reflection that Claimant attends doctor's appointments, visits the cemetery and church, prepares snacks for herself, and gets taken grocery shopping with her daughter's mother-in-law. (R. 25).  The ALJ next concluded that Claimant was literate in English because she was a United States citizen, and in order to obtain citizenship, one must certify that she is literate in English. Id.  The ALJ found that Claimant could perform her past relevant work because there was no lifting and carrying required at that work, and therefore, it fell within her RFC to perform light work. (R. 26).  Because the ALJ found that Claimant had the RFC to perform light work and could thus perform her previous employment, he stopped at this point and did not continue on to step five.

**B.     Analysis**

        1.     The ALJ's Determination at Step Two

Claimant argues that the ALJ incorrectly determined that she did not have severe medically determinable impairments at step two. The Social Security Regulations explain that "if the impairment is not severe [at step two], the plaintiff is not disabled and the evaluation ends." 20 C.F.R. § 404.1520(a)(4). When the ALJ determined that Claimant's impairments of peripheral neuropathy and depression were not severe, the evaluation should have ended at that point. However, the ALJ went on to steps three and four and later discussed musculoskeletal impairments caused by carpel tunnel syndrome, lumbago, degenerative disc disease, and osteoarthritis in Claimant's right shoulder, though he never discussed such impairments, nor explained whether they were severe at step two. In Cotter v. Harris, the Third Circuit explained that "we need from the ALJ not only an expression of the evidence he considered which supports the result, but also some indication of the evidence which was rejected. In the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." 642 F.2d 700, 705 (3d Cir. 1981). Since the ALJ's decision does not explain why any of Claimant's impairments are severe, yet proceeds past step two and addresses certain musculoskeletal impairments, the Court finds the ALJ's decision that there were no severe impairments at step two illogical and not based on substantial evidence. The Court, therefore, remands the matter so that the ALJ can provide a more thorough analysis and explanation as to which of Claimant's impairments he found severe at step two.

        2.     The ALJ's RFC Determination That Claimant Could Perform Light Work

With respect to the ALJ's determination of Claimant's RFC, "the ALJ's findings of residual functional capacity must 'be accompanied by a clear and satisfactory explanation of the basis on which it rests.'" Fargnoli v. Massanari, 247 F.3d 34, 41 (3d Cir. 2001) (quoting Cotter, 642 F.2d at 704). The Court has considered the ALJ's findings at step four and concludes that even if there was some reason, in light of his determination of no severe impairments, to have proceeded to steps three and four, the ALJ did not properly explain his basis at step four for finding that Claimant is capable of light work.

In evaluating Claimant's mental disabilities, the ALJ did not explain why he discredited Dr. Strika, and incorrectly applied the medical records of Dr. Roy. In particular, the ALJ did not properly set forth his reasons for rejecting Dr. Strika's medical records. The ALJ simply states, "Dr. Strika's report . . . lacks clinical findings to support the doctor's opinion." (R. 22). However, he does not explain why he viewed Dr. Strika's records differently from any of the other doctor's records. The ALJ also incorrectly applied Dr. Roy's medical records. For instance, the ALJ stated that Dr. Roy's medical records indicated that Claimant was not in psychiatric treatment, not taking any psychiatric medication and that her mental status examination was entirely normal. Id. In fact, the record reflects that Dr. Roy's examination did find that Claimant was not in psychiatric treatment, but never addressed the topic of psychiatric medications and did not express that Claimant's mental

7

status was entirely normal.[2] (R. 143). Moreover, the record indicates that Claimant actually was on psychiatric medications as proscribed by both Dr. Tunia and Dr. Strika. (R. 116, 124). Further, the ALJ failed to consider the Psychiatric Review Technique, Mental Residual Functional Capacity Assessment, or Claimant's testimony regarding her mental disability. Therefore, with respect to the issue of mental disabilities, the Court remands this matter in order for the ALJ to reevaluate the record.

As to the issue of physical disabilities, the Court finds that the ALJ did not base his findings on substantial evidence. The ALJ discredited certain doctor's evaluations without giving reasonable explanations for doing so. The ALJ completely discredited Dr. Tiger's opinion simply because he had been retained by Claimant's lawyer to examine Claimant for a Worker's Compensation claim, as well as Dr. Strika's claim because he had given Claimant six weeks disability. Although the ALJ was correct to note that he had no obligation to follow Dr. Strika's finding of disability, this did not give the ALJ reason to fully discredit Dr. Strika without explaining his reasons for doing so. The ALJ also relied on Claimant's testimony to find she was not physically disabled because: (a) she would leave her house a couple times a week to visit church or the cemetery; (b) she could make herself light snacks; and (c) her daughter's mother-in-law would take her food shopping once a week. (R. 250-51). However, the ALJ failed to analyze Claimant's testimony that she: (a) had to crawl on her hands and feet to get up stairs; (b) could not walk a full block; and (c) could not grasp anything due to her swollen hands. (R. 252-53). As summarized in Kent v. Schweiker "a single piece of evidence will not satisfy the substantiality test if the Secretary ignored, or failed to resolve, a conflict created by countervailing evidence." 710 F.2d 110, 114 (3d Cir. 1983) (citing Cotter, 642 F.2d at 706). The ALJ cannot give weight to some of Claimant's testimony and ignore other parts, without providing an explanation. Therefore, with respect to the issue of physical disabilities, the Court remands in order for the ALJ to reevaluate the record.

   3.  The ALJ's Determination at Step Four

The Court has also considered the ALJ's findings with regard to Claimant's ability to do her past relevant work and, based on the reasons that follow, concludes that the ALJ did not base his finding on that issue on substantial evidence.

Claimant contends that the translator at the administrative hearing mistranslated questions and responses which affected the ALJ's determinations at step four.[3] In particular, Claimant's

---

[2] Dr. Roy's examination explained Claimant had problems with simple tests of memory and had a poor fund of general information.

[3] The Court notes that although an interpreter of the Macedonian language was apparently present to assist Claimant at the administrative hearing, the ALJ found Claimant, a United States citizen, to be literate in the English language given that literacy is prerequisite for United States citizenship. (R. at 26). 8 U.S.C. § 1423 (a)(1) requires that a person have an "ability to read, write, and speak words in *ordinary usage*." (emphasis added). Because ordinary English language usage may not coincide with the language used in the courtroom, Claimant required a

daughter wrote a letter to the Office of Disability Adjudication and Review claiming that the translator was fluent in Sub-Croatian, not Macedonian, which resulted in her mistranslating some of the ALJ's questions and Claimant's responses. (R. 219). For instance, she claimed that the translator stated that her and her mother worked in different places in the same building, but that they actually worked together in the same office. (R. 218). Claimant's daughter explained the importance of such mistranslation, stating that the job was created specifically for Claimant so that she could work alongside her daughter and have instructions explained to her by her daughter in Macedonian. Claimant's daughter also claimed that the translator asked her mother if "*heavy lifting* was required" at the file clerk position, but that the judge only asked if "*lifting* was required;" thus, when her mother answered "*no*," she was answering the wrong question. Id. (emphasis added). She stated that her mother actually lifted charts which weighed between three to twelve pounds. Id. This mistranslation would mean, according to Claimant's daughter, that the medical records job actually required more than light work. Given that the ALJ's determination at step four was based heavily upon Claimant's answers to two of the allegedly mistranslated questions, the Court directs the ALJ to conduct a new hearing with a different translator so that such questions may be clarified.[4]

## CONCLUSION

For the reasons discussed above, the Court remands the ALJ's decision with instructions that the ALJ provide a thorough analysis and explanation as to which of Claimant's impairments he found severe at step two and why and to reevaluate the record as to both Claimant's mental impairments and physical impairments. Further, the matter is remanded so that the two allegedly mistranslated questions can be clarified using a new translator, and for a reevaluation of Claimant's ability to perform her past relevant work.

An appropriate Order accompanies this Opinion.

/s/ Jose L. Linares
JOSE L. LINARES,
UNITED STATED DISTRICT JUDGE

---

translator to correctly translate questions and responses during the hearing.

[4] At step four, the ALJ also found that Claimant could perform her past relevant work as a sewing machine operator because no lifting or carrying was required. (R. 26). However, the ALJ did not discuss how Claimant's musculoskeletal impairments would not affect her ability to perform repetitive motions. On remand, the ALJ should explain, using substantial evidence contained in the record, how he arrived at the conclusion that Claimant could perform such past work.